## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PEEKAY ACQUISITION, LLC, *et al.*,[1] | Case No. 17-11722 (___) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF ALBERT ALTRO IN SUPPORT OF FIRST DAY PLEADINGS

I, Albert Altro, hereby declare as follows:

1.     I am the Chief Restructuring Officer ("CRO") of Peekay Acquisition, LLC (together with its debtor subsidiaries and affiliates, "Peekay" or the "Company") and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[2] I am also a Managing Director at Traverse, LLC, a limited liability company that has served as a restructuring advisor to the Debtors since November 9, 2016. I have over twenty five (25) years of experience in corporate restructuring, public accounting and executive management, and consulting spanning a variety of industries and organizations. In my capacity as CRO, I have overseen the preparations for the Debtors' chapter 11 filing and been involved in responding to diligence requests and negotiating with the Debtors' key constituencies. In this capacity, I have become familiar with the Debtors' business, day-to-day operations and financial affairs.

2.     On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Peekay, Inc. (3429); Peekay Boutiques, Inc. (7972); Christals Acquisition, LLC (0391); Peekay Acquisition, LLC (0923); Peekay SPA, LLC (2765); ConRev, Inc. (2441); Condom Revolution, Inc. (6019); Charter Smith Sanhueza Retail, Inc. (8963); ZJ Gifts F-2, L.L.C. (3565); ZJ Gifts F-3, L.L.C. (3562); ZJ Gifts F-4, L.L.C. (8006); ZJ Gifts F-5, L.L.C. (7062); ZJ Gifts F-6, L.L.C. (4381); ZJ Gifts I-1, L.L.C. (5099); ZJ Gifts M-3, L.L.C. (8925); ZJ Gifts M-1, L.L.C. (7202); and ZJ Gifts M-2, L.L.C. (6643). The Debtors' corporate headquarters and mailing address is 901 West Main Street, Suite A, Auburn, WA 98001.

[2] A chart showing the corporate structure of the Debtors is attached hereto as Exhibit A.

(as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors are requesting various types of relief in certain "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things: (i) authorizing the Debtors to utilize cash collateral, with the consent of the Term A Lenders (defined below), in order to continue the Debtors' operations during the Chapter 11 Cases; (ii) preserving customer relationships; (iii) maintaining vendor confidence and employee morale; (iv) ensuring the continuation of the Debtors' cash management systems and other business operations; and (v) establishing certain administrative procedures to facilitate a smooth transition into chapter 11.

4.      I submit this declaration (the "First Day Declaration") in support of the First Day Motions. I am familiar with the contents of each First Day Motion, including the exhibits attached thereto, and believe that the relief sought is (i) necessary to preserve the value and productivity of the Debtors' operations, (ii) integral to the proposed sale of substantially all the Debtors' assets to maximize value for all of the Debtors' stakeholders, and (iii) in the best interests of the Debtors' estates, their creditors and other parties in interest.

5.      Except as otherwise indicated herein, all statements set forth in this First Day Declaration are based on: (i) my personal knowledge as the CRO of the Debtors' operations and financial affairs; (ii) materials provided by, as well as discussions with, members of the Debtors'

executive and management teams; (iii) information provided by the Debtors' advisors; or (iv) information obtained from my review of relevant documents.  Additionally, the opinions asserted in this First Day Declaration are based on my experience and knowledge of the Debtors' operations, financial condition and liquidity.  If called upon to testify, I could and would competently testify to the facts and opinions set forth in this First Day Declaration.  I am authorized to make the statement in and submit this First Day Declaration on behalf of each of the Debtors.

6.     Section I of this Declaration provides an overview of these Chapter 11 Cases and the Debtors' proposed course for the Chapter 11 Cases.  Section II describes the Debtors' business. Section III describes the Debtors' capital structure. Section IV describes the circumstances giving rise to the commencement of these Chapter 11 Cases.  Section V sets forth certain facts in support of the First Day Pleadings.

**SECTION I**
**OVERVIEW OF THE CHAPTER 11 CASES AND THE DEBTORS' PROPOSED**
**COURSE FOR THE CHAPTER 11 CASES**

7.     The Debtors' objective in these Chapter 11 Cases is the same as it has been since the middle of 2015 when it became evident that the Company did not have sufficient liquidity to service its debt obligations – to restructure the Company's balance sheet in order to maximize the value of the Company's assets for the benefit of all stakeholders and to maintain the business as a going concern, thereby preserving hundreds of jobs and important vendor relationships. With those goals in mind, beginning in May 2015, the Company and its professional advisors engaged in multiple restructuring initiatives to address the Company's balance sheet, including exploring an initial public offering of the Company's stock, multiple out-of-court restructuring proposals, and an extensive marketing and sale process to find a purchaser for the Company's assets.  Indeed, in connection with the marketing and sale process, which began in March 2016

(i.e., more than 17 months ago), the Company and its advisors contacted over one hundred fifty one (151) potential buyers, executed sixty three (63) non-disclosure agreements and provided diligence to numerous potential buyers. The foregoing resulted in eight (8) letters of intent, the most recent of which was entered into in May 2017. Ultimately, however, no executable transaction came from these extensive marketing efforts, including the most recent letter of intent, which terminated in July 2017, precipitating these Chapter 11 Cases.

8.      During this time, the Debtors have worked extensively with the Company's Prepetition Lenders (defined below) to facilitate a successful restructuring and to maintain the Company's business as a going concern. First, beginning in February 2016, the Prepetition Lenders agreed to forbear from exercising remedies available to them under the Prepetition Financing Agreement (defined below) in order to provide the Company with additional time to implement its various restructuring initiatives – even after the more than $38 million of Term A Loans and Term B Loans (as such terms are defined below) matured in February 2016. Second, beginning in June 2016, the Term A Lenders agreed, subject to the terms of the Forbearance Agreement (defined below), to stop receiving monthly cash interest payments in order to provide the Company with desperately needed liquidity. Third, as the Debtors began to explore an in-court proceeding, the Term A Lenders consented to funding the administration of the Debtors' Chapter 11 Cases through the use of their cash collateral, subject to the terms of the Cash Collateral Order (defined below).

9.      Finally, in July 2017, after the most recent letter of intent terminated and it became evident that the Company had exhausted all of its out-of-court restructuring options, the Term A Lenders submitted their stalking horse bid to purchase substantially all of the Company's assets. The Company and the Term A Lenders then engaged in extensive

negotiations that culminated in the Company's entry into the Asset Purchase Agreement (defined below) under which the Term A Lenders have agreed to credit bid their Term A Loans in the amount of $30 million up to the Credit Bid Cap (defined below) and assume certain liabilities to purchase substantially all of the Company's assets, subject to higher or otherwise better offers.

10.    Simultaneously with the commencement of the Chapter 11 Cases, the Debtors have filed a motion seeking approval of bidding procedures pursuant to which a competitive sale process will take place.  In particular, the bidding procedures establish a "Credit Bid Cap" of $31 million – which is the maximum amount of debt that the Stalking Horse Bidder can credit bid for the Debtors' assets.  This Credit Bid Cap will eliminate any risk of the Stalking Horse Bidder submitting a substantial overbid in the form of a credit bid and, as a result, potential bidders will be incented, at the very outset of the Chapter 11 Cases, to participate in the sale process.  Importantly, as an additional incentive to induce potential bidders to participate in the sale process, the bidding procedures do not grant any bid protections to the Stalking Horse Bidder, thereby lowering the bar of entry for potential bidders.

11.    The Debtors believe that the proposed marketing and sale process for the Debtors' assets is the only and best path forward.  This process will prevent the Company's business from deteriorating further, allow the Company's business to continue as a going concern, thereby preserving jobs and important vendor relationships, and will ensure that the Company obtains maximum value for their assets for the benefit of all of their stakeholders.  Further, as set forth above, the Term A Lenders have consented to the Debtors' usage of cash collateral, which will provide the Debtors with sufficient liquidity to operate during the Chapter 11 Cases and to effectuate the marketing and sale process for the benefit of all of the Company's stakeholders.

## SECTION II
## OVERVIEW OF THE DEBTORS' BUSINESS, HISTORY AND CORPORATE STRUCTURE

12.    Headquartered in Auburn, Washington, Peekay is a leading specialty retailer of a broad selection of lingerie, sexual health and wellness products and accessories. The Company's mission is to provide a warm and welcoming retail environment for individuals and couples to explore sexual wellness. Peekay currently owns and operates forty-seven retail stores across six states under the brand names "Christals," "Lovers," "ConRev" and "A Touch of Romance."

### A.    Company History

13.    Peekay was founded in 1982 in Auburn, Washington by a mother and daughter team with a focus on creating a comfortable and inviting store environment catering to women and couples. The Company has created unique retail environments that foster an attitude of acceptance of its products and allows customers to obtain education on sexual wellness topics.

14.    The Company offers a broad selection of products consisting of over five thousand (5,000) stock keeping units ("SKUs"). Peekay's retail locations are designed and built to create a visually inspiring environment and the Company employs highly trained, knowledgeable sales staff, which ensures that customers leave stores enlightened by new information, great ideas and fun products.

### B.    The Sexual Wellness Industry

15.    Peekay is a specialty retailer at the forefront of the growing mainstream acceptance of sexual health and wellness products. The Company participates in the health, wellness and lifestyle industry, which includes beauty and anti-aging products, fitness and exercise, mind/body products and experiences, healthy eating, nutrition and weight loss sales. It also includes over the counter drugs, complementary and alternative medicines and devices.

16.    On a global basis, this industry is estimated at over one trillion dollars according to Women's Marketing.  Product categories within the sexual health and wellness continuum, which Peekay offers in its stores and on its website, include personal care products (including lubricants, lotions and moisturizers), nutritional supplements, gifts, contraceptives, and sexual products and devices.  The rapid growth of this consumer sector is driven by the influence that the aging of the population of baby boomers has on the current consumer market and the increased pursuit across all ages of activities and behaviors that promote longevity and quality of life.

17.    The increased acceptance of this sector by shoppers of all ages, especially women, has led retailers that serve the health and wellness segment to introduce a wider assortment of products.  Sexual health and wellness products can be found on the shelves and are available on websites of some of America's most prominent retailers, including Walmart and Amazon.  One important factor in the growing mainstream acceptance of sexual wellness products is the change in attitudes in major publications.  National periodicals such as Men's Health, Rolling Stone, Redbook, Maxim and Cosmopolitan regularly feature articles and accept advertising for vendors such as Trojan, Durex, Liberator and Lelo.  Cable television has also begun to echo the trends of sexual health and wellness in advertising by Trojan, Durex and Adam and Eve and programming such as Sex and the City, Two Broke Girls, Two and a Half Men, Dr. Oz, and Oprah.

18.    Peekay also participates in the intimate apparel market, which is estimated at approximately $13 billion annually.  The Company's stores carry a wide selection of lingerie, body stockings, undergarments and other soft goods, similar to those offered by Victoria's Secret, Nordstrom and Macy's.

C.      **The Company's Store Design**

19.     The Company's stores are designed and built to appeal to a mainstream customer base.  Exterior signage is designed, constructed and installed so that the signs and logos are visible, well-lit and easy to read.  The entrance to retail stores typically consists of glass windows featuring high-end lingerie displays coordinated by the Company's corporate visual merchandising department.  Every detail of Peekay's stores is intended to convey a welcoming, open and friendly shopping environment.

20.     The Company recently developed a brand new retail store design with the assistance of an all-female design team.  The new store layout is designed to flourish in high-end shopping centers with a fun, welcoming and open atmosphere.  The design incorporates energetic colors and dynamic lighting, which is aligned with the shopping preferences of today's mainstream women and couples.  The new design prototype recently was rolled out at five locations in California.

D.      **Merchandise**

21.     The Company employs a five-member merchandising team responsible for product sourcing, vendor negotiations and relationship management, purchasing, planning and analysis, as well as visual merchandising.  Peekay uses "trend-right" in-store displays, which are custom-made, feature tables designed to showcase elegant collections of seasonal merchandise. The Company's merchandising philosophy is focused on understanding its customer's needs.

22.     Peekay offers its customers a variety of wellness- and sexual health-related products. Products are designed for women and couples to enhance their sexual satisfaction and meet their broad range of expectations. The product offering ranges from entry-level price points to premium, high-end brands. Peekay has over five thousand (5,000) SKUs available ranging

from $1 condoms to $265 vibrators. Seasonally, new products represent 20-25% of the overall product assortment.

23.     During the 2015 fiscal year, the Company's breakdown of sales by product category was as follows:

- Sales of wellness products constituted approximately forty seven percent (47%) of sales. These items include massagers, vibrators, personal care, and restraints, including brands such as Jimmy Jane, Pipedream, We Vibe and Sutera™ Toys.

- Sales of gift items and essentials constituted approximately thirty seven percent (37%) of sales. These items include personal lubricants, apothecary, candles, condoms, sensitizers and desensitizers, including brands such as Crazy Girl, Kamasutra, Earthly Body and System Jo.

- Sales of lingerie constituted approximately sixteen percent (16%) of sales. Lingerie includes a broad range of sleepwear, body stockings, club wear, costumes, corsets, babydolls, hosiery and panties, including brands such as Dreamgirl, Coquette, Escante and Rene Rofe.

24.     In addition to the Company's broad retail brand portfolio, Peekay also offers Sutera™ private label merchandise. In 2015, due to supply chain issues, the Company elected to liquidate its remaining inventory of Sutera products and not replenish its stock until a more reliable manufacturer is located.  The Company expects to have a new private label assortment ready for market in 2018.

25.     Consistent with the Company's "wellness" focus, it has minimized the visual product offering category, which consists of DVD and video sales because these products are not generally sought by Peekay's target demographic.

## E.     Marketing and Advertising

26.     Peekay markets its retail stores through a variety of channels, including billboards, direct mail, radio, interactive and social media and grassroots events.  All new stores are allocated a marketing budget dedicated to a grand opening event.  The Company has an

integrated marketing plan that extends from out-of-store to in-store elements, including posters, signage and displays created by a professional in-house design staff.

**F.    Peekay's Store Locations and Business Operations**

27.     Peekay selects geographic areas and store sites on the basis of demographic information, the quality and nature of neighboring tenants, store visibility and location accessibility. It seeks to locate stores primarily in or near centers with major national brands and regional brands such as Target, Walgreens, TJ Maxx, Sally Beauty Supply, Starbucks and others.

28.     The Company operates forty-six (46) stores under four different branded banners: Lovers, A Touch of Romance, ConRev and Christals.  The Christals stores, located in Texas, Tennessee and Iowa, were acquired in October 2012.  The Lovers, A Touch of Romance and ConRev stores were acquired on December 31, 2012, and are located in Washington, Oregon and California.  As of December 31, 2016, the average life of these stores is just over fifteen (15) years, which demonstrates marketplace acceptance.

29.     Peekay strives to complement its extensive merchandise selection and innovative store design with superior customer service.  To accomplish this objective, the Company actively recruits individuals with significant knowledge and experience in the field of lingerie and sexual health and wellness products. Employees' knowledge of the products and ability to explain the advantages of the products increases sales and their prompt, knowledgeable service fosters the confidence and loyalty of customers and differentiates Peekay's business from other retailers of lingerie, sexual health and wellness products.  Employees are trained to foster a warm and welcoming retail environment for individuals and couples to explore sexual wellness. This attitude of acceptance and education for consumers sets Peekay apart from its competitors.

30.     The Company provides extensive training to its sales associates and employees to emphasize product knowledge.  The training programs encompass operational and product

training and are designed to increase employee and store productivity.  Store employees are also required to participate in training on an ongoing basis to keep up-to-date on new products and operational practices.

31.    Most of the Company's stores are staffed with a store manager, assistant store manager and two or three part-time associates. District managers, who report directly to the Vice President of Retail, supervise the operations of each store.  As of August 1, 2017, Peekay had a total of 338 employees, 136 of whom are full-time employees. The majority of employees are involved in retail sales and the remainder provide various management, back-office and support functions.

**SECTION III**
**THE DEBTORS' CAPITAL STRUCTURE**

**A.    Secured Debt**

32.    On December 31, 2012, debtors Christals Acquisition, LLC, Peekay Acquisition, LLC, and the subsidiaries of Peekay Acquisition, LLC listed as "Borrowers" on the signature pages thereto, as borrowers and guarantors, entered into a financing agreement (the "Prepetition Financing Agreement") with Cortland Capital Market Services LLC, as collateral agent for the secured lenders (the "Prepetition Collateral Agent").   Under the Prepetition Financing Agreement and all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith (collectively with the Prepetition Financing Agreement, the "Prepetition Loan Documents"), the lenders thereto (the "Prepetition Lenders") made a term loan to the borrowers initially in the aggregate principal amount of $38,215,939, consisting of a tranche A term loan for the principal amount of $27,000,000 (the "Term A Loans" and the Prepetition Lenders providing the Term A Loans, the "Term A Lenders"), and a tranche B term loan for the

principal amount of $11,215,930 (the "Term B Loans" and the Prepetition Lenders providing the Term B Loans, the "Term B Lenders"). The proceeds of the loans made under the Prepetition Financing Agreement were used to repay then existing indebtedness, to finance a portion of the purchase price payable in connection with the Company's acquisition of Peekay and ConRev, to fund working capital requirements and to pay fees and expenses related to the Peekay and ConRev acquisitions.

33.    The loans made under the Prepetition Financing Agreement are secured by first priority liens on substantially all of the Debtors' assets, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles (including, without limitation, all payment intangibles), goods, instruments (including, without limitation, promissory notes), inventory, investment property, copyrights, patents and trademarks and licenses, letter-of-credit rights, supporting obligations, proceeds (including cash and noncash proceeds) and products of any of the foregoing collateral. Pursuant to the Prepetition Financing Agreement, the Term A Loans are senior in priority and must be indefeasibly paid in full in cash before any payment can be made on account of the Term B Loans.

34.    The loans made under the Prepetition Financing Agreement originally matured on December 27, 2015, which maturity date was extended through February 15, 2016. As of February 22, 2016, the Debtors were in default under the Prepetition Financing Agreement as recognized in the Forbearance Agreement (defined below). The Debtors' defaults have continued since that time. As of the Petition Date, the Debtors are obligated to pay $27,000,000.00 in aggregate principal amount to the Term A Lenders, plus accrued but unpaid interest and fees in the amount of approximately $8,494,500.00. Further, as of the Petition Date, the Debtors are obligated to pay $14,483,841.86 in aggregate principal amount to the Term B

Lenders, plus accrued but unpaid interest and fees in the amount of approximately $1,982,995.63.

**B.    The Seller Notes**

35.    In late 2012, the Company completed two separate transactions in which it acquired the Christals, Peekay and ConRev stores (the "Acquired Stores"). The prior owners of the Acquired Stores provided partial seller financing associated with these acquisitions in the form of $12,700,000 million in notes payable (the "Seller Notes"). The terms of the Seller Notes allow for unpaid interest to be added to the principal ("PIK Interest") on a quarterly basis. As of the Petition Date, the total amount owing, including the PIK Interest, was approximately $19 million.

36.    The Seller Notes are unsecured and subordinated to the obligations to the Term A Lenders and Term B Lenders under the Prepetition Financing Agreement. Certain of the Seller Notes matured on December 31, 2016 and the remaining Seller Notes matured on January 9, 2017.

**C.    Other Unsecured Debt**

37.    As of the Petition Date, the Debtors estimate that their unsecured debt, excluding amounts due in connection with the Seller Notes, is between $1,500,000 and $1,600,000, and consists primarily of accounts payable to vendors and accrued but unpaid expenses.

**D.    Equity**

38.    Peekay Boutiques, Inc., the ultimate parent of the Debtors, is a former public reporting company with thirty (30) shareholders. The major shareholders include the following, along with each shareholder's approximate percentage owned: (i) Christopher F. Brown (12.77%); (ii) Edward J. Tobin (28.87%); (iii) Ellery W. Roberts (6.92%); and (iv) Harvest

Capital Credit Corporation (5.95%).  The remaining twenty six (26) shareholders each hold less than five percent (5%) of the issued and outstanding equity of Peekay Boutiques, Inc.

## SECTION IV
## EVENTS LEADING TO THESE CHAPTER 11 CASES

39.    In the months leading up to the February 15, 2016 maturity date under the Prepetition Financing Agreement, the Company attempted to effectuate an initial public offering of its common shares in order to raise sufficient capital to pay off the Term A Loans and Term B Loans (the "IPO").  The Company initially sought to register the IPO under the Securities Act of 1933 and, to that end, filed a preliminary registration statement on Form S-1 with the SEC on May 5, 2015 and subsequently amended the preliminary registration statement on November 23, 2015.

40.    As the market for public offerings deteriorated in the fourth quarter of 2015, the Company decided, with the consent of the Prepetition Lenders, to delay the IPO until the first quarter of 2016.  To avoid a default under the Prepetition Financing Agreement, the Company requested, and the Prepetition Lenders agreed, to enter into that certain Eight Amendment to Financing Agreement dated as of December 2, 2015 (the "8th Amendment").  By the 8th Amendment, the Prepetition Lenders agreed to extend the maturity date of the Prepetition Financing Agreement to February 15, 2016 in exchange for, among other things, an amendment fee of .50% of the then outstanding indebtedness under the Prepetition Financing Agreement.

41.    By February 15, 2016, the Company still had not been able to effectuate its IPO and did not otherwise have sufficient cash to satisfy the obligations owing under the Prepetition Financing Agreement.  Accordingly, on February 26, 2016, the Company and certain of the Term A and Term B Lenders entered into that certain Forbearance and Ninth Amendment Agreement (the "Forbearance Agreement").  Pursuant to the Forbearance Agreement, the

Company agreed to grant certain Term A Lenders warrants to purchase up to 2.5% of the common shares of the Company. Further, under the Forbearance Agreement, the Company was required to complete a "Step One Restructuring Transaction" by April 15, 2016 and a "Step Two Restructuring Transaction" by July 31, 2016. A "Step One Restructuring Transaction" is generally defined in the Forbearance Agreement as an (a) initial public offering; (b) debt refinancing; or (c) sale transaction, in each case resulting in cash proceeds sufficient to satisfy the Term A Loans in full. A "Step Two Restructuring Transaction" is generally defined in the Forbearance Agreement as an out-of-court restructuring or a pre-arranged chapter 11 bankruptcy on terms acceptable to the Term A Lenders.

42.     By March 31, 2016, the Company was in default of its obligations under the Forbearance Agreement. On that date, the Term A Lenders agreed to further extend the Company's deadline to grant the warrants and enter into a "Step Two Restructuring Term Sheet" until April 11, 2016. A Step Two Restructuring Term Sheet, however, was not executed by April 11, 2016. Since that time, the Term A Lenders have had the right to call a default and exercise remedies under the Prepetition Financing Agreement and Forbearance Agreement, upon 24 hours' written notice to the Company. The Term A Lenders' remedies under the Prepetition Financing Agreement and Forbearance Agreement include, but are not limited to, sweeping cash from the Company's bank accounts and requiring turnover of Peekay Boutiques, Inc.'s equity interests in its subsidiaries.

43.     As the public offering market demonstrated continued weakness in January 2016, the Company's investment bankers began discussions with the Company's Board of Directors regarding strategic alternatives. In February 2016, in connection with the Forbearance Agreement, the Company's investment bankers began contacting potential buyers and continued

this process through mid-March 2016. During this process, seventy five (75) potential buyers were contacted, composed mainly of financial sponsors with a consumer and/or retail focus, as well as a handful of strategic buyers. From this process, thirty-eight (38) non-disclosure agreements were executed and management calls were conducted with twelve (12) potential buyers. From these management interactions, the Company collected two indications of interest and three letters of intent. Ultimately, no executable transaction came from these extensive marketing efforts.

44.    Likewise, in May 2016, in connection with the Forbearance Agreement, the Company proposed a consensual, out-of-court balance sheet restructuring proposal to all of its major creditor and equity constituencies. That effort, however, was also unsuccessful. Given the Company's ongoing liquidity constraints, beginning in June 2016, the Term A Lenders agreed to forbear from exercising remedies as a result of the Company's failure to make cash interest payments.

45.    On September 27, 2016, a potential strategic purchaser (the "Strategic Purchaser") sent a proposed letter of intent that contemplated a sale of substantially all of the Company's assets in a bankruptcy proceeding. On or about September 30, 2016, two of the Debtors' Term B Lenders transmitted a balance sheet restructuring proposal to the Company's Board of Directors, but that proposal did not contain any details regarding various assumptions (including the valuation) contemplated therein or how such a transaction could be executed without consent of the Term A Lenders. Throughout this period, the Term A Lenders repeatedly asserted their position that they would not consent to a balance sheet restructuring in which junior creditors received a recovery unless the claims of the Term A Lenders were satisfied in full. On

November 7, 2016, the Company engaged SSG Advisors, LLC ("SSG") as its investment bankers to assist with a sale of assets or restructuring of the Company's balance sheet.

46.    On November 30, 2016, the Term A Lenders provided the Company with a draft asset purchase agreement and indicated their willingness to purchase the Company's assets pursuant to a credit bid of the then outstanding obligations held by the Term A Lenders. Following receipt of the asset purchase agreement from the Term A Lenders, the Company and its advisors re-engaged with the Strategic Purchaser in an attempt to negotiate an asset sale and out-of-court restructuring that would satisfy the obligations to the Term A Lenders in full in cash and potentially obviate the need for a bankruptcy filing.

47.    On January 23, 2017, the Company, with the support of the Term A Lenders, entered into a letter of intent (the "January 2017 LOI") with the Strategic Purchaser. The January 2017 LOI contemplated an out of court sale transaction of substantially all of the Company's assets that would have provided sufficient consideration to (i) satisfy in full the obligations owed to the Term A Lenders; and (ii) provide a small return on account of the obligations owed to the Term B Lenders. However, in March 2017, the Company terminated the January 2017 LOI after the Strategic Purchaser failed to satisfy certain conditions contained therein.

48.    On February 2, 2017, the Term A Lenders agreed to a further extension of the Forbearance Agreement (the "February Extension") through April 7, 2017 in exchange for the Company's agreement to pay $150,000 to the Term A Lenders on account of accrued, unpaid interest and to pay current interest payments due on the first of February and March 2017. Under the parties' agreement, the February Extension was to remain in effect until such time as (i) the January 2017 LOI was terminated; (ii) the Company failed to pay the required interest due under

the February Extension; (iii) an additional default occurred under the Financing Agreement; or (iv) the Company breached any additional provision of the Forbearance Agreement.

49.     Following the termination of the January 2017 LOI and as a result of the February extension, the Company and its advisors continued their marketing efforts.  In April 2017, certain of the Term B Lenders submitted a second restructuring proposal.  That proposal, however, was rejected by the Debtors, after consultation with the Term A Lenders, because the Term A Lenders stated that they would not consent to a balance sheet restructuring in which junior creditors received a recovery unless the claims of the Term A Lenders were satisfied in full.

50.     In May 2017, the Strategic Purchaser again expressed interest in purchasing substantially all of the Debtors' assets.  On May 15, 2017, the Company entered into a second letter of intent (the "May 2015 LOI") with the Strategic Purchaser, again with the support of the Term A Lenders.  The Strategic Purchaser conducted diligence and engaged in extensive negotiations with the Company regarding the terms of the proposed transaction; however, the May 2015 LOI terminated in July 2015 without an executable transaction when the Strategic Purchaser declined to proceed with the transaction.

51.     From the time of its retention through the Petition Date, SSG contacted over one hundred twenty (120) parties, both strategic and financial, in an effort to sell the Company's assets and/or attract investment in a balance sheet restructuring (both in and out of out).  From that marketing process, twenty-six (26) potential purchasers and investors signed non-disclosure agreements, received a confidential information memorandum and were provided access to a dataroom established by SSG and the Company.  In addition to the offers from the Strategic Buyer, SSG solicited three (3) additional offers to purchase some or all of the Company's assets;

all three of the additional offers were rejected by the Company based on insufficient consideration.

52.    As a result, the Company's marketing efforts ultimately resulted in entry into the asset purchase agreement with the Term A Lenders (the "Asset Purchase Agreement") pursuant to which the Term A Lenders have agreed to credit bid the value of their Term A Loans in the amount of $30 million (up to the Credit Bid Cap) and assume certain liabilities to purchase substantially all of the Company's assets.   The Company and its advisors have engaged in extensive negotiations which led to entry into the Asset Purchase Agreement pursuant to which the Debtors seek to sell substantially all of their assets as a going-concern, subject to higher and better offers received during a competitive bidding process.

## SECTION V
## FACTS IN SUPPORT OF FIRST DAY PLEADINGS[3]

53.    To minimize the adverse effects of the commencement of the Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed the following First Day Motions:

- Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases;

- Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to File (A) A Consolidated List of Creditors in Lieu of Filing a Separate Mailing Matrix for Each Debtor, and (B) A Consolidated List of the Debtors' Thirty Largest Unsecured Creditors; and (II) Approving the Manner of Serving the Notice of Commencement;

- Application of the Debtors for Entry of an Order Appointing Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date;

---

[3] Capitalized terms used but not otherwise defined in this Section V have the same meanings given to such terms as in the respective First Day Motions.

- Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b);

- Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations;

- Motion of the Debtors for Entry of Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (B) Deeming Utilities Adequately Assured of Future Performance; and (C) Establishing Procedures for Determining Adequate Assurance of Payment;

- Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations;

- Motion of the Debtors for Interim and Final Orders Authorizing the Debtors to Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder, and Renew or Enter Into New Policies;

- Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business;

- Debtors' Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral ; (II) Granting Adequate Protection to the Prepetition Lenders; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief

54.    I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions. I believe that the relief requested by the First Day Motions is necessary to enable to the Debtor to preserve and maximize value and efficiently implement their restructuring efforts with minimal disruption and delay.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 10th day of August, 2017.

By: _____
Albert Altro
Chief Restructuring Officer
Peekay Boutiques, Inc., *et al.*

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 10th day of August, 2017.

By: _____

Albert Altro
Chief Restructuring Officer
Peekay Acquisition, LLC, *et al.*

## Exhibit A

**Corporate Organizational Structure**

# Peekay Boutiques, Inc., *et al.* Corporate Structure

