## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PEEKAY ACQUISITION, LLC, *et al.*,[1] | Case No. 17-11722 (BLS) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING A HEARING TO CONSIDER THE SALE, (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION, (IV) ESTABLISHING NOTICE AND CONTRACT PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (V) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) <u>GRANTING RELATED RELIEF</u>**

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), by and through their undersigned proposed counsel, hereby file this motion (the "<u>Motion</u>") pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (as amended or modified, the "<u>Bankruptcy Code</u>"); rules 2002, 6003, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"); and rule 6004-1 of the Local Rules (the "<u>Local Rules</u>") of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), for entry of two orders: (a) the first order,

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Peekay, Inc. (3429); Peekay Boutiques, Inc. (7972); Christals Acquisition, LLC (0391); Peekay Acquisition, LLC (0923); Peekay SPA, LLC (2765); Conrev, Inc. (2441); Condom Revolution, Inc. (6019); Charter Smith Sanhueza Retail, Inc. (8963); ZJ Gifts F-2, L.L.C. (3565); ZJ Gifts F-3, L.L.C. (3562); ZJ Gifts F-4, L.L.C. (8006); ZJ Gifts F-5, L.L.C. (7062); ZJ Gifts F-6, L.L.C. (4381); ZJ Gifts I-1, L.L.C. (5099); ZJ Gifts M-3, L.L.C. (8925); ZJ Gifts M-1, L.L.C. (7202); and ZJ Gifts M-2, L.L.C. (6643). The Debtors' corporate headquarters and mailing address is 901 West Main Street, Suite A, Auburn, WA 98001.

substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bid Procedures Order</u>") (i) approving

the procedures (the "<u>Bid Procedures</u>")[2] in connection with the solicitation and acceptance of

higher and better bids, as set forth in the asset purchase agreement (the "<u>Stalking Horse APA</u>")[3]

by and among the Debtors and TLA Acquisition Corp. (the "<u>Stalking Horse Bidder</u>") with

respect to the proposed sale (the "<u>Sale</u>") of substantially all of the Debtors' assets (as defined in

the Stalking Horse APA, the "<u>Acquired Assets</u>"), (ii) scheduling a hearing for approval of the

Sale (the "<u>Sale Hearing</u>") and setting objection deadlines with respect to the Sale, (iii) approving

the form and manner of notice (the "<u>Sale Notice</u>")[4] of the Sale and related auction (the

"<u>Auction</u>") for the Acquired Assets, (iv) establishing procedures to determine cure amounts and

deadlines for objections to the potential assumption and assignment of executory contracts and

unexpired leases, and (v) granting related relief; and (b) the second order, substantially in the

form attached hereto as <u>Exhibit C</u> (the "<u>Sale Order</u>")[5] (i) authorizing and approving the Stalking

Horse APA, (ii) authorizing the Sale free and clear of Encumbrances[6] other than Permitted

Encumbrances, with such Encumbrances to attach to the Sale Proceeds (if any) (iii) authorizing

the assumption and assignment of certain executory contracts and unexpired leases, and (iv)

granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Bankruptcy Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§

157 and 1334 and the Amended Standing Order of Reference from the United States District

---

[2] A copy of the proposed Bid Procedures is attached as Exhibit 1 to the Bid Procedures Order.

[3] A copy of the Stalking Horse APA is attached hereto as <u>Exhibit B</u>.

[4] A copy of the proposed notice of Auction is attached as Exhibit 2 to the Bid Procedures Order.

[5] Exhibit C will be filed with the Bankruptcy Court prior to the objection deadline for the Motion.

[6] Capitalized terms used but not defined herein shall have the same meanings given to such terms as in the Stalking Horse APA, the Bid Procedures, and/or the First Day Declaration (defined below), as applicable.

Court for the District of Delaware dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.[7] Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The predicates for the relief sought herein are Bankruptcy Code sections 105(a), 363, 365, 503 and 507, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007 and 9008, and Local Rule 6004-1.

## BACKGROUND

3.      On August 10, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court commencing the above-captioned cases (the "Chapter 11 Cases").

4.      The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

5.      As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

6.      Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' business and capital structure is set forth in the *Declaration of Albert Altro in Support of First Day Pleadings* (the "First Day Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

---

[7] Pursuant to Local Rule 9013-1(f) the Debtors hereby confirm their consent to entry of a final order by the Bankruptcy Court in connection with this Motion if it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

A.    **The Debtors' Liquidity Constraints, Marketing Process and Lack of Alternatives to a Sale**

7.      As set forth in additional detail in the First Day Declaration, the Debtors have been actively marketing their assets since March 2016, the result of which is the proposed Stalking Horse APA.  At the same time, the Debtors' liquidity has grown tighter and tighter, thereby necessitating these Chapter 11 Cases and approval of the Bid Procedures described herein.

8.      Although the Debtors have been marketing their assets for more than 17 months, the proposed Bid Procedures contemplate a marketing process in the Chapter 11 Cases and a bid deadline of October 18, 2017 (the "Bid Deadline").  The Debtors believe that the marketing period, which will have spanned approximately 17 months prior to the Petition Date and approximately 9 weeks during the Chapter 11 Cases, is a reasonable and sufficient period to solicit bids on the Debtors' assets.  These marketing efforts will be sufficient to ensure the highest and best offer, particularly in light of the Debtors' limited financing options, ongoing cash needs and extensive, multi-year prepetition marketing efforts.  Further, the Debtors believe that a delayed process likely would lead to the deterioration of the operating performance of the business and the value of their assets.

9.      The Debtors also believe, based on consultations with their professionals, that the Bid Procedures negotiated with the Stalking Horse Bidder will solicit the highest or otherwise best offer for the Debtors' assets under the circumstances of the Chapter 11 Cases.

10.      In particular, the Bid Procedures set forth a "Credit Bid Cap" (as defined further below), which caps the amount of debt that the Stalking Horse Bidder can credit bid for the Debtors' assets.  As a result, potential bidders will know, at the very outset of the Chapter 11 Cases, the price point at which the Stalking Horse Bidder and Term A Lenders are prepared to

walk away from the assets.  By removing the possibility of a substantial overbid by the Stalking

Horse Bidder, potential bidders will be far more incented to participate in the sale process.  In

addition, as a further incentive to induce potential bidders to participate in the sale process, the

Bid Procedures do not grant *any* bid protections to the Stalking Horse Bidder, thereby lowering

the bar of entry for potential bidders.

11.    In sum, the proposed Sale to the Stalking Horse Bidder provides the best

alternative for all of the Debtors' creditor constituencies and stakeholders.  Given that the

Debtors have no realistic restructuring option other than the transaction proposed in the Stalking

Horse APA, the only alternative to the Sale would be a conversion to Chapter 7 and a piecemeal

liquidation of the Debtors' assets, which surely would result in a loss of the Debtors' operating

business, less value to the Debtors' stakeholders and the loss of hundreds of jobs.

12.    To maintain the support of the Debtors' customers and vendors, and maintain the

Debtors' employee base, it is in the best interests of the Debtors and their estates to move

expeditiously with the sale process, as discussed herein.  The Debtors' business is a customer

service business, and maintaining customer confidence is crucial for its viability and maximizing

value for the Debtors' estates.

**B.    The Stalking Horse APA**

13.    The following chart summarizes key provisions of the Stalking Horse APA and

highlights certain provisions as required by Local Rule 6004-1(b)(iv), but are qualified in their

entirety by reference to the terms set forth in the Stalking Horse APA:

| | |
|---|---|
| **Purchase Price** (Stalking Horse APA, Section 3.1)<br><br>**Local Rule 6004-1(b)(iv)(N)** | In consideration for the Acquired Assets, Buyer shall assume the Assumed Liabilities by executing the Assumption Agreement and Buyer shall credit bid an aggregate amount equal to the Term Loan A Claims held by Buyer in an amount equal to Thirty Million Dollars ($30,000,000.00), such Purchase Price to be paid by Credit Bid pursuant to a dollar-for-dollar reduction of the Term Loan A Claims held by Buyer. |
| **Purchase Price Allocation** (Stalking Horse APA, Sections 2.6)<br><br>**Local Rule 6004-1(b)(iv)(H)** | No later than forty-five (45) days following the Closing, Buyer shall deliver to the Selling Entities an allocation of the Purchase Price (and the Assumed Liabilities) among the Acquired Assets (the "Allocation"). The Selling Entities agree to file all Tax Returns consistent with the Allocation unless otherwise required by applicable Law. The Bankruptcy Court shall not be required to apply the Allocation in determining the manner in which the Purchase Price should be allocated as between the Selling Entities and their respective estates. |
| **Acquired Assets** (Stalking Horse APA, Section 2.1) | The Acquired Assets constitute substantially all of the Selling Entities' assets, including, without limitation: (i) all Cash, including all Store-Level Cash, other than Retained Cash; (ii) all Accounts Receivable; (iii) all Inventory, Merchandise, Display Merchandise, supplies and materials; (iv) all restricted cash deposits of the Selling Entities held by any party and relating to the Acquired Assets, all Credit Card Deposits, all royalties, advances, prepaid and deferred assets, security and other deposits, prepayments and other current assets; (v) Non-Real Property Contracts, the Real Property Leases and the Additional Assumed Contracts; (vi) all Seller IP; (vii) Assumed Purchase Orders; (viii) all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements and other tangible personal property and fixed assets; (ix) all books, records, information, files, data and plans, advertising and promotional materials and similar items; (x) all claims and causes of action (other than, in each case, to the extent related solely to the Excluded Assets), including all claims and causes of action that any of the Selling Entities may have (a) against the Selling Entities' Representatives; and (b) under Chapter 5 of the Bankruptcy Code; (xi) all goodwill associated with the Business or the Acquired Assets; (xii) all rights of the Selling Entities under non-disclosure or confidentiality, non-compete, or non-solicitation agreements; (xiii) all of the Permits related to the Acquired Assets; (xix) amounts of, or rights to, any insurance claims made or proceeds received in respect of Acquired Assets or Assumed Liabilities; (xv) all rights under or arising out of insurance policies in respect of the Business or the Acquired Assets; (xvi) any rights, demands, claims, credits, allowances, rebates and rights of setoff arising out of or relating to any of the Acquired Assets; (xvii) all telephone and facsimile |

| | |
|---|---|
| | numbers, web sites, web domain names and addresses; (xviii) all rights of the Selling Entities' in and to the company headquarters location and all warehouse and distribution facilities; and (xix) all other assets related to, used in connection with, or necessary for the ownership, operation and management of the Acquired Assets, the Business, and the Stores. |
| **Assumed Liabilities (Stalking Horse APA, Section 2.3)** | The Assumed Liabilities are limited to: (a) the Liabilities arising solely and directly under the Assumed Contracts from and after the date assumed and assigned to Buyer and which shall not include any Liability for any Cure Amounts or for any breach thereunder occurring prior to the date assumed and assigned to Buyer; (b) the Liabilities arising solely and directly under the Assumed Purchase Orders; (c) all Taxes to the extent expressly payable by Buyer pursuant to Section 7.8 of the Stalking Horse APA; (d) all Consumer Liabilities, other than Liabilities arising under any escheatment, abandoned property or similar Law; (e) the Allowed 503(b)(9) Claims, if any, up to the 503(b)(9) Claim Cap; and (f) Liabilities solely and directly with respect to Transferred Employees arising on and after the Closing Date, except for any Liabilities with respect to and/or claims of any Transferred Employee arising out of or related to their employment by any of the Selling Entities, any conduct of any of the Selling Entities and/or any of the Selling Entities' operation of the Business. |
| **Excluded Assets (Stalking Horse APA, Section 2.2)** | Excluded Assets are defined as those items specifically enumerated in the Stalking Horse APA, including, without limitation: (a) Excluded Insurance Policies; (b) all intercompany obligations; (c) any confidential records, documents or other information relating to Excluded Employees, to the extent disclosure of which to Buyer would violate applicable Law; (d) the Selling Entities' minute books and other corporate books and records relating to their organization and existence and records which any of the Selling Entities are required to retain by applicable Law; (e) the Selling Entities' rights under the Stalking Horse APA and the other Transaction Documents; (f) any Contracts of any Selling Entities other than the Assumed Contracts and Additional Assumed Contracts; (g) any shares of capital stock or other equity interests of any of the Selling Entities; (h) any prepaid income Tax, Tax receivable, Tax refund or Tax rebate of a Selling Entity with respect to any period ending on or prior to the Closing; (i) any Seller Benefit Plan; (j) all rights, claims and causes of action, including rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of the Selling Entities to the extent solely and specifically related to the Excluded Assets or Excluded Liabilities; (k) all prepaid charges and deposits in respect |

|  | of telephone, electricity, water and sewer and other utilities that are required to be funded by the Selling Entities; and (l) all bank and deposit accounts, which for the avoidance of doubt, shall include no Cash other than Retained Cash.  Buyer shall have the right in, its sole discretion, to (x) reject any of the Acquired Assets by providing written notice to the Selling Entities of its election to reject any such assets until the date that is two (2) Business Days prior to the Closing Date, in which event such assets shall be deemed Excluded Assets for purposes of the Stalking Horse APA, and (y) add any of the Excluded Assets to the list of Acquired Assets by providing written notice to the Selling Entities of its election to add any such assets until the date that is two (2) Business Days prior to the Auction (provided that if the Auction does not occur because there are no Qualified Bidders, then Buyer may provide written notice of its election to add any such assets until the date that is two (2) Business Days prior to the Closing Date), in which event such Excluded Assets shall be deemed Acquired Assets for purposes of the Stalking Horse APA . |
|---|---|
| **Excluded Liabilities** (Stalking Horse APA, Section 2.4) | The Debtors shall retain all liabilities and obligations that are not Assumed Liabilities and the Sale Order shall include express findings of no successor liability and shall enjoin any person or entity from asserting any claim based on any liabilities or obligations of the Debtors against the Buyers. |
| **Cure Payments** (Stalking Horse APA, Section 2.5) | Prior to the Auction, Buyer shall determine which executory contracts and unexpired leases from the Contracts Schedule will constitute Assumed Contracts to be assigned to Buyer (the agreements so assumed and assigned, the "Assigned Contracts"), subject to removal of Assigned Contracts by Buyer prior to Closing. The Selling Entities shall promptly pay all Cure Amounts in connection with such assumption and assignment of the Assigned Contracts. The Selling Entities shall also promptly pay all Cure Amounts in connection with the assumption and assignment of any Additional Assumed Contracts. |
| **Closing** (Stalking Horse APA, Section 4.1) **Local Rule 6004-1(b)(iv)(E)** | The closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated by the Stalking Horse APA (the "Closing") shall take place remotely via the exchange of documents and signatures no later than the second (2nd) Business Day following the date on which the conditions set forth in Article 8 of the Stalking Horse APA have been satisfied or, to the extent permitted, waived by the applicable Party in writing, or at such other place and time as Buyer and Seller may mutually agree in writing. |
| **Termination** | The Stalking Horse APA may be terminated at any time prior to the |

| | |
|---|---|
| **(Stalking Horse APA, Section 9.1)** | Closing by: (a) mutual written consent of Seller and Buyer; (b) Seller or Buyer if any of the conditions to each Party's obligations to effect the Closing set forth in Section 8.1 of the Stalking Horse APA are or become incapable of being satisfied on or prior to the Outside Date; (c) Buyer on written notice to any Selling Entity, if not cured within ten (10) days after notice, fails to perform or comply with the covenants or agreements to be performed prior to Closing, or any of the representations and warranties of any Selling Entity become inaccurate as of the date of the Stalking Horse APA or shall have become inaccurate as of a date subsequent to the date of the Stalking Horse APA and the Selling Entities fail to remedy such inaccuracy within twenty (20) days after notice such that the condition set forth in Section 8.2(f) of the Stalking Horse APA would not then be capable of satisfaction; (d) Seller on written notice to Buyer, if not cured within ten (10) days after receipt of notice shall have failed to perform or comply with any of the covenants or agreements contained in the Stalking Horse APA to be performed and complied with by Buyer prior to Closing such that the condition set forth in Section 8.3(a) of the Stalking Horse APA would not then be capable of satisfaction, or any of the representations and warranties of Buyer shall be inaccurate as of the date of the Stalking Horse APA, or shall have become inaccurate as of a date subsequent to the date of the Stalking Horse APA and Buyer fails to remedy such inaccuracy within twenty (20) days after notice thereof from Seller, such that the condition set forth in Section 8.3(b) of the Stalking Horse APA would not then be capable of satisfaction as of the date of the Stalking Horse APA or such subsequent date, as applicable; (e) Buyer if any of the Selling Entities enters into a definitive agreement with respect to a Third-Party Sale, or by either Buyer or Seller if the Bankruptcy Court approves a Third-Party Sale, or automatically if a Third-Party Sale is consummated, or by Buyer if any of the Selling Entities seeks to have any Third-Party Sale approved by the Bankruptcy Court; (f) Buyer if the Seller or any Selling Entity moves to dismiss any of the Bankruptcy Cases, moves for conversion of any of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or moves for appointment of an examiner; (g) Buyer if a trustee or an examiner is appointed in the Bankruptcy Cases or any of the Bankruptcy Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; (h) Buyer if any court of competent jurisdiction shall enter a judgment or order declaring the Stalking Horse APA unenforceable; (i) Buyer or Seller if the Closing shall not have occurred by 5:00 p.m. (Eastern Time) on the date that is eighty (80) days after the Petition Date (the "Outside Date"), which date may be extended by Buyer in its sole discretion; (j) Buyer if any of the Selling Entities' conditions to Closing set |

| | |
|---|---|
| | forth in <u>Section 8.2</u> of the Stalking Horse APA becomes incapable of satisfaction on or prior to the Outside Date; (k) Buyer if a Termination Date occurs under and as defined in any Order authorizing the use of cash collateral and/or debtor-in-possession financing in the Bankruptcy Case prior to the Closing Date; or (l) Buyer if in its reasonable determination, Buyer or the Term A Lenders are or could be unable to Credit Bid for the Acquired Assets in accordance with the Stalking Horse APA. |
| **<u>Cooperation</u>**<br>**(Stalking Horse APA, Section 7.4)** | As promptly as reasonably practicable after the date of the Stalking Horse APA, each of the Selling Entities and Buyer shall (and shall cause their respective Affiliates to) use its commercially reasonable efforts to make any filings and notifications, and to obtain any Consents from Governmental Authorities (other than the Bankruptcy Court), required to be made and obtained under applicable Law in connection with the transactions contemplated by the Stalking Horse APA as promptly as reasonably practicable. |
| **<u>Tax Exemption</u>**<br>**(Stalking Horse APA, Section 10.14)**<br><br>**Local Rule 6004-1(b)(iv)(I)** | Buyer waives compliance by the Selling Entities with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Acquired Assets to Buyer. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. |
| **<u>Access to Records</u>**<br>**(Stalking Horse APA, Section 7.2)**<br><br>**Local Rule 6004-1(b)(iv)(J)** | The Stalking Horse APA permits the Buyer and its representatives reasonable access to the Selling Entities' records prior to the earlier of termination of the Stalking Horse APA and final dissolution of the Selling Entities and their estates. The Stalking Horse APA also permits the Selling Entities and their representatives reasonable access to the Selling Entities' records sold pursuant to the Stalking Horse APA. |
| **<u>Good Faith Deposit</u>**<br>**(Bid Procedures p. 5)**<br><br>**Local Rule 6004-1(b)(iv)(F)** | No deposit is required of the Stalking Horse Bidder. However, a good faith deposit is required for all other Qualified Bidders as set forth in the Bid Procedures. |
| **<u>Sale to Insider</u>**<br><br>**Local Rule 6004-1(b)(iv)(A)** | The Stalking Horse Bidder is not an insider of any of the Debtors. |

| | |
|---|---|
| **Agreements with Management**<br><br>**Local Rule 6004(iv)(B)** | None. |
| **Sale of Avoidance Actions (Stalking Horse APA, Sections 2.1(j))**<br><br>**Local Rule 6004-1(b)(iv)(K)** | The Acquired Assets include all claims and causes of action of the Selling Entities as of the Closing, including all claims and causes of action that any of the Selling Entities may have under Chapter 5 of the Bankruptcy Code. |
| **Releases (Stalking Horse APA, Sections 4.2(h), 4.3(c) & (d))** | At or prior to the Closing, Selling Entities shall deliver to Buyer a release, in form and substance acceptable to Buyer and the Term A Lenders, pursuant to which the Selling Entities release any and all causes of action and Claims which they may have held against Buyer and the Term A Lenders and each of their respective Representatives.<br><br>At or prior to the Closing, Buyer shall deliver to Selling Entities (i) a release, in form and substance acceptable to the Selling Entities, pursuant to which Buyer and the Term A Lenders release any and all causes of action and Claims which they may have held solely in their respective capacities as Term A Lenders (but not in any other capacity or for any other purpose), against the Selling Entities and each of their respective Representatives, solely in respect of the Term Loan A Claims that are being satisfied pursuant to the Credit Bid; and (ii) a release, in form and substance acceptable to the Selling Entities, pursuant to which Buyer and the Term A Lenders release any and all causes of action and Claims held by them against the Selling Entities' Representatives, including all causes of action and Claims which they may have acquired pursuant to Section 2.1(j) of the Stalking Horse APA. |
| **Successor Liability**<br>**Local Rule 6004-1(b)(iv)(L)** | The proposed Sale Order will contain limitations on successor liability, and Buyer will require that the order approving the Sale contain such limitations. |
| **Interim Arrangements with Buyer (Stalking Horse APA, Sections 7.7(h))**<br><br>**Local Rule 6004-1(b)(iv)(G)** | The Stalking Horse APA may require, at Buyer's election, the Buyer and Selling Entities to negotiate in good faith a transition services agreement pursuant to which the Selling Entities would, on commercially reasonable terms, agree to continue to employ all employees who are to be Transferred Employees and to maintain its payroll processing systems, Seller Benefit Plans and other applicable insurance policies, and Buyer would pay the Selling Entities for all amounts owing in respect thereof when due, in each case for a period of not more than six (6) months following the |

| | Closing Date. |
|---|---|
| **Provisions Requested in the Bid Procedure Order** | The form of the proposed Bid Procedures Order approved by the Stalking Horse Bidder is attached hereto as <u>Exhibit A</u> and certain key provisions requested therein are further described below. |
| **Relief from Bankruptcy Rule 6004** | To preserve the value of the Acquired Assets and limit the costs of administering and preserving such assets, it is critical that the Debtors close the Sale as soon as possible after all closing conditions have been achieved or waived. Additionally, the Stalking Horse APA requires the Closing to within eighty (80) days following the Petition Date. Accordingly, the Debtors request that the Bankruptcy Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h). |

## C.    **Proposed Bid Procedures**

14.    The Debtors seek to conduct an open, robust and transparent sale process pursuant to which the Successful Bidder (defined below) will enter into an asset purchase agreement, substantially in the form of the Stalking Horse APA, for the purchase of substantially all of the Debtors' assets free and clear of all Encumbrances, with such Encumbrances attaching to the proceeds (if any) of the Sale.

15.    The Bid Procedures, as summarized below, were developed consistent with the Debtors' need to proceed with an expedited sale process to preserve the going-concern value of the Debtors' assets, and with the objective of promoting active bidding that will result in the highest or otherwise best offer for such assets. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, fair, and open, fashion that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close the Sale.

16.    The following paragraphs in this section summarize key provisions of the Bid Procedures, and are qualified in their entirety by reference to the actual Bid Procedures.

a.    <u>Access to Due Diligence Materials</u>. In order to access diligence materials and information related to the Debtors' assets, each Potential Bidder must first deliver (unless previously delivered) to the Debtors' investment banker and counsel the

following items prior to the Bid Deadline (collectively, the "Participation Requirements"): (i) an executed confidentiality agreement in form and substance reasonably acceptable to the Debtors; and (ii) identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Sale.

b.  Participation Requirements.  In order to be eligible to participate in the Auction for the Acquired Assets, each Potential Bidder, other than the Stalking Horse Bidder or its designee or assignee, must be determined by the Debtors, in consultation with the Term A Lenders and the official committee of unsecured creditors (the "Committee"), if any, to have submitted a Qualified Bid (defined below) (each a "Qualified Bidder").  The Debtors shall have the right, in consultation with the Term A Lenders and the Committee, if any, to determine whether a bidder is a Qualified Bidder. The Stalking Horse Bidder is a Qualified Bidder, and the Stalking Horse APA is a Qualified Bid.  The Stalking Horse Bidder, or its designee or assignee, is entitled to credit bid all or a portion of its secured claims against the Debtors, without otherwise complying with the Bid Procedures, to the fullest extent permissible under Bankruptcy Code section 363(k).  Notwithstanding anything contained herein or in any order of the Bankruptcy Court, the Stalking Horse Bidder's Credit Bid shall not exceed $31 million (the "Credit Bid Cap").

c.  Qualified Bidder.  In order for any Potential Bidder to be considered a Qualified Bidder (other than the Stalking Horse Bidder and its designee or assignee, who is already considered a Qualified Bidder), such Potential Bidder (or a combination of Potential Bidders whose bids for the assets of the Debtors do not overlap and who agree to have their bids combined for the purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) must submit a written offer (a "Qualified Bid") such that it is received prior to the Bid Deadline and meets the following criteria:

    i.  The Same or Better Terms.  A bid must be on terms that, in the Debtors' business judgment, in consultation with the Term A Lenders and the Committee, if any, are substantially the same or better than the terms of the Stalking Horse APA; provided, that such bid must include a cash purchase price that, at a minimum, exceeds the aggregate sum of (a) the Stalking Horse bid, plus (b) the initial overbid amount of $100,000 (i.e., $30,100,000) (together, the "Minimum Initial Bid"); provided, further, that notwithstanding anything contained herein or the Bid Procedures Order, Potential Bidders are encouraged to contact the Debtors to discuss modifications and alternatives to the Minimum Initial Bid, including, without limitation, Minimum Initial Bids that consist of a combination of cash and secured "take back" notes.

    ii.  Executed and Marked Asset Purchase Agreement.  A bid must

include fully executed Sale documents, pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale. A bid shall include a redlined copy of the Stalking Horse APA (the "Modified APA") to show all changes requested by the Qualified Bidder, including those related to the purchase price in accordance with subsection (i) above, and identify each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing.

iii.    No Contingencies.  A bid may not be conditioned on obtaining internal approval, obtaining financing or on the outcome or review of due diligence, and a bid shall not contain any contingencies to the validity, effectiveness, and/or binding nature of the bid beyond those contained and that remain effective in the Stalking Horse APA.

iv.    Legal Capacity.  A bid must be accompanied by documentation that, in the Debtors' reasonable business judgment, in consultation with the Term A Lenders and the Committee, if any, demonstrates that the Potential Bidder has the legal capacity to fund a purchase price in the amount of the Minimum Initial Bid as set forth above, and otherwise consummate the proposed transaction.

v.    Authorization to Bid.  Each bid, other than any bid by the Stalking Horse Bidder, must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA.

vi.    Back-Up Bidder.  Each bid must contain an agreement for the Qualified Bidder to be a Back-Up Bidder (defined below).

vii.    No Fees Payable to Qualified Bidder.  A bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

viii.    Financing Sources.  A bid, other than any bid made by the Stalking Horse Bidder, must contain evidence of the ability to consummate the Sale satisfactory to the Debtors, in consultation with the Term A Lenders and the Committee, if any, with appropriate contact information for all such financing sources (whether cash or borrowings) and may not contain any financing contingency (or conditions to borrowings).

ix.    Other Evidence. Each bid, other than any bid made by the Stalking Horse Bidder, must contain evidence satisfactory to the Debtors, in their reasonable discretion, in consultation with the Term A

Lenders and the Committee, if any, that the Qualified Bidder (based on availability of financing, experience and other considerations or conditions) will be able to timely consummate the Sale to purchase the Acquired Assets if selected as the Successful Bidder.

x.    Representation of Non-Collusion.  Pursuant to Local Rule 6004-1, each bidder participating at the Auction must confirm its Non-Collusion Representation.

xi.    Proof of Ability to Close.    Written evidence that enables the Debtors and their representatives to determine, in their reasonable discretion, in consultation with the Term A Lenders and the Committee, if any, that the Potential Bidder has the ability to close the contemplated Sale and provide adequate assurance of future performance under all contracts to be assumed in such contemplated Sale.

xii.    Deposit.  Before the Bid Deadline, each Potential Bidder must pay an earnest money cash deposit of ten percent (10%) of the Minimum Initial Bid and any other consideration contained in the relevant Qualified Bid (a "Qualified Bidder Deposit") by cashier's or certified check or wire transfer of immediately available funds (pursuant to instructions to be obtained from Debtors' counsel), which deposit shall be held in escrow in Debtors' counsel's IOLTA trust account in accordance with the terms of an escrow agreement to be provided by the Debtors (in a form acceptable to Debtors' counsel in its sole discretion).    A Qualified Bidder Deposit will be refunded only if the bid corresponding with the Qualified Bidder Deposit is not approved by the Bankruptcy Court. The Debtors reserve the right to hold each Qualified Bidder Deposit until five (5) days after the closing of the sale of the Acquired Assets to, as the case may be, the Stalking Horse Bidder or the Successful Bidder.

d.  Bid Deadline.  The Bid Deadline for a Potential Bidder to submit a bid (other than the Stalking Horse Bidder or its designee or assignee) shall be October 18, 2017 at 12:00 p.m. (ET).  A bid received after the Bid Deadline shall not constitute a Qualified Bid.  The Term A Lenders have the right to be provided with all bids upon receipt of such bids by the Debtors.

Prior to the Bid Deadline, a Potential Bidder, other than the Stalking Horse Bidder, that desires to make an offer, solicitation or proposal shall deliver a written copy of its bid to the Debtors' proposed investment banker, SSG Advisors, LLC, Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, Pennsylvania 19428, Attn: J. Scott Victor (e-mail jsvictor@ssgca.com) and proposed counsel to the Debtors, Landis Rath & Cobb

LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Adam G. Landis, Esq. and Matthew B. McGuire, Esq.). Counsel to the Debtors shall promptly provide email copies of such bids to (i) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Juliet Sarkessian, Esq.), (ii) counsel to the Committee, if any, and (iii) counsel to the Term A Lenders, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178 (Attn: Steven J. Reisman, Esq. and Shaya Rochester, Esq.) and Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq.).

e.   Auction.  Only in the event that the Debtors receive at least one (1) Qualified Bid (other than that of the Stalking Horse Bidder) by the Bid Deadline, the Debtors shall conduct the Auction of the Acquired Assets to determine the highest or otherwise best bid with respect to the Acquired Assets.  No later than 4:00 p.m. (ET) on the day that is one business day before the Auction, the Debtors will notify all Qualified Bidders and, if formed, counsel to the Committee, whether the Auction will occur and will provide each Qualified Bidder with a copy of all Qualified Bids.  The Auction shall commence at 10:00 a.m. (ET) on October 25, 2017 at the offices of Landis Rath & Cobb, LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801.

The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder, including the Stalking Horse Bidder (collectively, the "Auction Participants").  Each Qualified Bidder must attend the Auction in person in order to bid at the Auction.  While only the Auction Participants may bid at the Auction, the Auction may be attended and viewed also by the Debtors, their professionals, Auction Participants, the Committee, if any, and its professionals.  Any creditor wishing to attend the Auction may do so by contacting, no later than three (3) business days prior to the start of the Auction, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801, Attn: Joseph Wright (e-mail: wright@lrclaw.com).

The Debtors and their professional advisors shall direct and preside over the Auction.  At the beginning of the Auction, the Debtors and their professional advisors will, in consultation with the Term A Lenders and the Committee, if any, announce the highest Qualified Bid received by the Bid Deadline which shall serve as the baseline bid at the Auction (the "Baseline Bid").  All bids made thereafter shall be Overbids (defined below), and shall be made and received on an open basis, and all material terms of each bid shall be fully disclosed to all other Qualified Bidders, including the Stalking Horse Bidder and the Term A Lenders.  The Auction shall be transcribed and all bids shall be made on the record and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (defined below).

f.   Overbids.  An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid.  Any Qualified Bidder's initial Overbid shall be at least $100,000 in cash (or cash equivalents) in excess of the

Baseline Bid, and each subsequent Overbid must be made in increments of at least $100,000 in cash, cash equivalents or such other consideration that the Debtors deem equivalent, in consultation with the Term A Lenders and Committee, if any, over the previous highest or best bid (the "Minimum Overbid Increment); provided, however, that the Stalking Horse Bidder's Overbid may be in the form of an increase in its Credit Bid.

Any Overbid made by a Qualified Bidder (including with respect to any Back-Up Bid (defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors accept a higher Qualified Bid as an Overbid. The Debtors shall announce at the Auction the material terms of each such Overbid and the basis for calculating the total consideration offered in each such Overbid.

g. Sale Hearing. The Sale Hearing shall be conducted by the Bankruptcy Court on a date and time to be determined.

h. Modifications. Except as otherwise provided in the Bid Procedures, the Debtors, after consultation with the Term A Lenders and the Committee, if any, may modify the Bid Procedures; provided that all such modifications are disclosed to all Potential Bidders or Qualified Bidders, as applicable, prior to or during the Auction.

i. Determination and Rejection of Bids. The Debtors, in their reasonable business judgment and in a manner consistent with their fiduciary duties, after consultation with the Term A Lenders and the Committee, if any, may (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject, at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of the Sale; or (iii) contrary to the best interests of the Debtors, their estates, their creditors and other stakeholders.

j. Closing the Auction. Upon conclusion of the bidding process, the Auction shall be closed, and the Debtors, in consultation with the Term A Lenders and Committee, if any, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Sale and the amount of the cash (or cash equivalents) consideration, and (ii) determine, the highest or otherwise best offer for the Acquired Assets (the "Successful Bid"), the entity submitting such Successful Bid (the "Successful Bidder"), the next highest or otherwise best offer after the Successful Bid (the "Back-Up Bid") and the entity submitting such Back-Up Bid (the "Back-Up Bidder"); and advise the Qualified Bidders of such determinations. The Back-Up Bid shall remain open, and the Back-Up Bidder shall be required to fully perform under such Back-Up Bid, until the earlier of consummation of the Sale with the Successful Bidder or sixty (60) days following the closing date contemplated in the Successful Bid.

For the avoidance of doubt, the Stalking Horse Bidder shall not be required to serve as the Back-Up Bidder.

17.     Pursuant to Local Rule 6004-1: (i) each bidder participating at the Auction will be required to make a non-collusion representation (a "Non-Collusion Representation"); (ii) the Auction will be conducted openly and may be attended by the Debtors, their professionals, the Committee, if any, and its professionals and the Auction Participants; (iii) the only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder, including the Stalking Horse Bidder; and (iv) the Auction will be transcribed. The Bid Procedures are typical for asset sales of this size and nature and require a deposit from each Qualified Bidder, other than the Term A. Lenders.

18.     Other than as expressly set forth in the Bid Procedures, the Debtors, after consultation with the Term A Lenders, reserve the right to: (a) waive terms and conditions set forth herein with respect to any or all Potential Bidders, (b) impose additional terms and conditions with respect to any or all Potential Bidders, (c) extend the deadlines set forth herein or the date for the Auction, (d) cancel or extend the sale of the Acquired Assets and/or Sale Hearing in open court; and (e) amend the Bid Procedures, in each case, so long as the exercise of any such right is consistent with the Debtors' fiduciary duties and the best interests of the Debtors' estates; provided, however, that the Debtors may not modify the Bid Procedures in any way that would materially impair the rights of the Stalking Horse Bidder under the Stalking Horse APA or the Term A Lenders.

19.     The Stalking Horse Bidder is a Qualified Bidder, and the Stalking Horse APA is a Qualified Bid.  The Stalking Horse Bidder, or its designee or assignee, is entitled to credit bid all or a portion of its secured claims against the Debtors, without otherwise complying with the Bid Procedures, to the fullest extent permissible under Bankruptcy Code section 363(k); provided,

that such credit bid shall be subject only to any challenge filed in accordance with and subject to the requirements of the Financing Orders.  If no such challenge is so commenced, no person or entity shall have any right to challenge any credit bid submitted by the Stalking Horse Bidder.  If any such challenge is commenced, the Stalking Horse Bidder may, in its sole discretion, withdraw the Stalking Horse Bid or seek other appropriate relief, including on an emergency basis.  Notwithstanding anything contained herein or in any order of the Bankruptcy Court, the Stalking Horse Bidder's Credit Bid shall not exceed the Credit Bid Cap.

**D.    Notice of Auction and Sale**

20.    The Debtors seek to have the Auction scheduled to commence at 10:00 a.m. (ET) on October 25, 2017 at the offices of Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801.  Within two (2) days of the entry of the Bid Procedures Order, the Debtors will serve by first class mail, postage prepaid, copies of: (i) the Bid Procedures Order; and (ii) the Sale Notice upon the following entities: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Stalking Horse Bidder and Term A Lenders; (c) counsel to the Committee, if any, or, if none formed, the creditors holding the thirty (30) largest unsecured claims as set forth on the list filed with the Debtors' petitions; (d) all taxing authorities having jurisdiction over any of the Acquired Assets subject to the Sale, including the Internal Revenue Service; (e) the Environmental Protection Agency; (f) the Securities Exchange Commission; (g) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (h) all of the Debtors' known creditors; (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order; (j) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets; and (k) any Potential Bidders previously identified or otherwise known to the Debtors (collectively, the "Sale Notice

Parties"). In addition, the Debtors will publish notice of the Sale in the national edition of either the *Wall Street Journal National Edition* or *USA Today* or similar publication.

21.    The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801; and (d) be served on: (i) counsel to the Debtors, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Adam G. Landis, Esq. and Matthew B. McGuire, Esq.); (ii) counsel to the Stalking Horse Bidder and the Term A Lenders, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178 (Attn: Steven J. Reisman, Esq. and Shaya Rochester, Esq.) and Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq.); (iii) counsel to the  Committee, if any; and (iv) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Juliet Sarkessian, Esq.) in accordance with Local Rule 2002-1(b) on or before 4:00 p.m. (ET) on the date that is seven (7) days prior to the Sale Hearing (the "Sale Objection Deadline").

**E.    Additional Provisions**

*Name Change*

22.    The Debtors hereby request the authority, upon and in connection with the Closing, to change their corporate names and the caption of these Chapter 11 Cases, consistent with applicable law.  The Debtors shall file a notice of change of case caption, containing the new caption and the proposed new corporate names of the Debtors, within ten (10) business days of the Closing, and the change of case caption for these Chapter 11 Cases shall be deemed effective as of the Closing.

**F.      Procedures Relating to Executory Contracts and Unexpired Leases,
         Including Determination of Cure Amounts and Deadlines for Objection
         to Assumption and Assignment of All Contracts**

23.      Given the number of executory contracts and unexpired leases to which the
Debtors are a party, the Debtors seek to establish (a) procedures for determining the Cure
Amounts and (b) the deadline for objections to the Cure Amounts and/or the proposed
assumption and assignment of executory contracts and unexpired leases (collectively, the
"Contract Procedures").

24.      Pursuant to Section 2.5 of the Stalking Horse APA, within five (5) business days
of the Petition Date, the Debtors will provide the Stalking Horse Bidder a schedule (such
schedule is referred to herein as the "Contracts Schedule") setting forth (x) each Contract to
which any of the Debtors is a party or by which any Debtor is bound, and (y) all Cure Amounts
(if any) for each such Contract, and (z) a detailed description of each such Contract.  The
Debtors shall update the Contracts Schedule to the extent any new Contract is entered into
postpetition or to include any revised Cure Amount with respect to any Contract listed on the
Contracts Schedule.

25.      On or before the date that is fifteen (15) days prior to the Sale Hearing, the
Debtors shall serve by mail a notice, substantially in the form annexed as Exhibit 3 to the Bid
Procedures Order (a "Cure Notice") on the non-Debtor counterparties to all Contracts on the
Contracts Schedule (collectively, the "Contract Parties").  To the extent the Contracts Schedule
is amended after the Sale Order, the Debtors shall promptly file and serve by mail a
supplemental Cure Notice (the "Additional Cure Notice") on the affected non-Debtor
counterparties, substantially in the form attached as Exhibit 4 to the Bid Procedures Order.

*Contract Objections*

26.    To facilitate a prompt resolution of (i) disputes relating to the Cure Amounts and (ii) any other objections relating to the assumption and assignment of the Contracts, the Debtors propose the following deadlines and procedures:

> The Contract Parties shall have until 4:00 p.m. (ET) on the date that is seven (7) days prior to the Sale Hearing (the "Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors and the Stalking Horse Bidder, to object (a "Contract Objection") to (i) the Cure Amounts listed by the Debtors and to propose alternative Cure Amounts, and/or (ii) the proposed assumption and assignment of the Contracts in connection with the Sale, including, without limitation, the Debtors' ability to assign the Contracts without the Contract Parties' consent or the adequate assurance of future performance to be provided by the Successful Bidder (or any designee thereof);

> - provided, however, if the Debtors amend the Cure Notice after the Contract Objection Deadline to add a contract or lease, the non-Debtor party to the added contract or lease shall have until the Sale Hearing to submit a Contract Objection with respect to the contract or lease added by the Debtors' amendment (the "Amended Contract Objection Deadline");

> - provided further, that if the Debtors amend the Cure Notice after the Contract Objection Deadline to reduce the Cure Amount of a Contract, except where such reduction was upon mutual agreement of the parties, the non-Debtor party to the reduced Cure Amount contract or lease shall have until the Amended Contract Objection Deadline to object to the Cure Amount with respect to the contract or lease with the Cure Amount that has been reduced by the Debtors' amendment; and

> - provided further, that in the event the Auction results in a Successful Bid other than the Stalking Horse APA, the Contract Parties shall have until the Amended Contract Objection Deadline to object to the assignment of Contracts to such Successful Bidder, other than to the Cure Amount which shall be subject to the Contract Objection Deadline, with any such objection being heard at the Sale Hearing or at a later-scheduled hearing as the Bankruptcy Court deems appropriate.

b.    The Debtors, the Contract Party, and the Successful Bidder may consensually resolve the Contract Objection prior to, or after, the Sale Hearing. In the event the Contract Objection is not resolved, such Contract Objection will be heard at the Sale Hearing or thereafter. To the extent it is determined that the Cure Amount exceeds the amount set forth in the Contract Schedule, the Successful Bidder may determine to not have assumed and assigned to it such Assigned Contract.

c.  Unless a Contract Objection is filed and served before the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable, all Contract Parties shall be:

- forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts (other than as may be asserted in an Additional Cure Notice), and the Debtors and the Successful Bidder shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notice or the Additional Cure Notice, as applicable;

- deemed to have consented to the assumption or assumption and assignment of the Contracts;

- forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist (other than as may be asserted in an Additional Cure Notice), that conditions to assignment must be satisfied under such Contracts, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Contracts, including without limitation, adequate assurance of future performance;

- precluded from objecting to the Cure Amounts (if any) and the assumption and assignment; and

- barred and estopped from asserting or claiming that an Assigned Contract contains an enforceable consent right.

### *Designation by the Stalking Horse or Other Qualified Bidder*

27.    Prior to the Bid Deadline, the Stalking Horse Bidder shall, by delivering written notice to the Debtors, designate each Contract on the Contracts Schedule it wishes to become an Assigned Contract.  The Stalking Horse Bidder may remove any Assigned Contract from such schedule prior to the Closing.

28.    Each Qualified Bidder, other than the Stalking Horse Bidder, shall, by delivering written notice to the Debtors on or before the Bid Deadline, designate each Contract on the Contracts Schedule it wishes to be an Assigned Contract.

{1097.001-W0048169.}

29.     Immediately prior to the Sale Hearing, the Debtors shall file the list of Assigned Contracts as of such date.

30.     The Debtors request that the Sale Order, among other things:

    a.  authorize and approve the assumption and assignment of the Assigned Contracts upon the Closing, without the need for any further action by any party, pursuant to Bankruptcy Code section 365;

    b.  provide that where the Debtors are unable to establish that a default exists under a Contract, the Cure Amount relating to such Assigned Contract shall be set at $0.00; and

    c.  find that the Successful Bidder has established adequate assurance of future performance necessary to satisfy the requirements of Bankruptcy Code section 365 in respect of the assignment to the Successful Bidder of the Assigned Contracts.

**RELIEF REQUESTED**

31.     By this Motion, the Debtors seek the entry of two orders of this Bankruptcy Court: (a) the Bid Procedures Order (i) approving the Bid Procedures in connection with the solicitation and acceptance of higher and better bids with respect to the Sale of the Acquired Assets, (ii) scheduling the Sale Hearing and setting objection deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Sale and related Auction, (iv) establishing procedures to determine Cure Amounts and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases, and (v) granting related relief; and (b) the Sale Order (i) authorizing and approving the Stalking Horse APA, (ii) authorizing the Sale free and clear of Encumbrances pursuant to the Stalking Horse APA, (iii) authorizing the assumption and assignment of the Assigned Contracts, and (iv) granting related relief.

32.     The Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders.  The Debtors and the Stalking Horse Bidder negotiated the terms of the Stalking Horse APA at arm's length, subject to higher or otherwise better offers.

## BASIS FOR RELIEF REQUESTED

### A.    The Bid Procedures Are Fair and Reasonable And Are Designed to Not Chill Bidding

33.    Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"). In the hope of maximizing the value received by the estates, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process. *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

34.    Here, the Debtors believe that the Bid Procedures are designed to maximize the value received for the Acquired Assets and prevent any chilling of potential bids by establishing a competitive and fair bidding process. In particular, the Credit Bid Cap, combined with the absence of *any* bid protections in favor of the Stalking Horse Bidder, will ensure that potential bidders are not deterred from participating in the sale process because they will know, at the very outset of the Chapter 11 Cases, the price point at which the Stalking Horse Bidder will walk away from the assets. Further, the process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing Potential Bidders with ample time and information to submit a timely bid and perform diligence. The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or

otherwise best possible purchase price by subjecting the value of the Acquired Assets to market testing and permitting prospective buyers to bid on the Acquired Assets.   Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable and that the proposed Bid Procedures will not chill bidding by any Potential Bidders.  Moreover, the proposed Bid Procedures are fair and appropriate in light of the robust prepetition marketing process undertaken by the Debtors and their professionals.

35.     Procedures to dispose of assets, similar to the proposed Bid Procedures have been approved in other large, complex chapter 11 cases in this district.  *See, e.g.*, *In re City Sports, Inc.*, Case No. 15-12054 (KG) (Bankr. D. Del. Oct. 23, 2015); *Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 11, 2015); *In re iGPS Co. LLC*, Case No. 13-11459 (KG) (Bankr. D. Del. July 31, 2013); *Tri-Valley Corp.*, Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); *WP Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012) *Capitol Infrastructure, LLC*, Case No. 12-11362 (KG) (Bankr. D. Del. May 15, 2012); *Traffic Control And Safety Corp.*, Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012); *Contract Research Solutions, Inc.*, Case No. 12-11004 (KJC) (Bankr. D. Del. April 12, 2012); *Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. January 11, 2012); *Dallas Stars, L.P.*, Case No. 11-12935 (PJW) (Bankr. D. Del. September 22, 2011).  In sum, the Debtors believe that the proposed Bid Procedures provide an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Acquired Assets.  Accordingly, the proposed Bid Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

B.     **The Overbid Protections Are Appropriate Under the Circumstances**

36.     The Minimum Overbid Increment is appropriate under the circumstances and will enable the Debtors to simultaneously maximize value while limiting the chilling effect in the

marketing process.  This provision also is consistent with the overbid increments previously approved by courts in this district.  *See, e.g., Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 11, 2015); *Tri-Valley Corp.*, Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); *WP Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012); *Solar Trust of Am., LLC*, Case No. 12-11136 (KG) (Bankr. D. Del. May 11, 2012); *Contract Research Solutions, Inc.*, Case No. 12-11004 (KJC) (Bankr. D. Del. April 12, 2012); *Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. January 11, 2012).

**C.    The Proposed Sale Notice, the Proposed Date for the Sale Objection Deadline, the Cure Objection Deadline and the Sale Hearing Are Appropriate**

37.    The Debtors submit that the Sale Objection Deadline is reasonable and appropriate under the circumstances.  Pursuant to Local Rule 9006-1(c)(ii), "[w]here a motion is filed and served in accordance with Local Rule 9006-1(c)(i), the deadline for objection(s) shall be no later than seven (7) days before the hearing date."  Del. Bankr. L.R. 9006-1(c)(ii).  As noted above, the Sale Hearing is more than twenty-one (21) days from notice of this Motion and the Sale Objection Deadline has been scheduled seven (7) days in advance thereof.  As such, the Debtors submit that the proposed Sale Objection Deadline meets the requirements of the Bankruptcy Rules and the Local Rules.

38.    The Debtors submit that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Bid Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadline; and (d) the Sale Hearing.  Therefore, the Debtors respectfully request that the Bankruptcy Court to approve the proposed notice procedures.

**D.     The Contract Procedures Provide Adequate Notice
and Opportunity to Object and Should be Approved**

39.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  As discussed in greater detail below, the standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).

40.     The Debtors respectfully submit that the proposed Contract Procedures are appropriate and reasonably tailored to provide the Contract Parties with adequate notice of the proposed assumption and assignment of the applicable Contract, as well as proposed Cure Amounts, if applicable.  Such Contract Parties will then be given an opportunity to object to such notice.  The Contract Procedures further provide that, in the event an objection is not resolved, the Bankruptcy Court will determine related disputed issues (including any adequate assurance of future performance issues).  Accordingly, the Debtors submit that implementation of the proposed Contract Procedures is appropriate in these Chapter 11 Cases.

41.     The Contract Procedures comport with the requirements of Bankruptcy Code section 365 (as described fully below) and Bankruptcy Rule 6006, and the non-Debtor contract counterparties' rights to adequate assurance are unaffected and fully preserved.  The Debtors respectfully submit that the notices required by the Contract Procedures are sufficient to assume and assign the Assigned Contracts because they are reasonably tailored to provide notice and an opportunity to object to the proposed assumption and assignment.  Thus, the Debtors submit that the Contract Procedures should be approved.

**E.     The Sale is Within the Sound Business Judgment
of the Debtors and Should Be Approved**

42.    The Debtors submit that ample authority exists for approval of the proposed Sale

to the Successful Bidder.   Bankruptcy Code section 363(b)(1) provides, in relevant part, that a

debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Bankruptcy Code

section 363 does not set forth a standard for determining when it is appropriate for a court to

authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.   However,

courts in the Third Circuit and others have required that the decision to sell assets outside the

ordinary course of business be based upon the sound business judgment of the debtor.   *See In re*

*Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In*

*re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re*

*Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery*

*Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del.

1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

43.    The "sound business judgment" test requires a debtor to establish four elements in

order to justify the sale or lease of property outside the ordinary course of business, namely, (a)

that a "sound business purpose" justifies the sale of assets outside the ordinary course of business;

(b) that adequate and reasonable notice has been provided to interested persons; (c) that the

debtor has obtained a fair and reasonable price; and (d) good faith.   *Abbotts Dairies*, 788 F.2d

143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a

debtor is "simply required to justify the proposed disposition with sound business reasons."   *In re*

*Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  *Lionel,* 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program and holding that the business purpose requirement was fulfilled, because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

44.    Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion any order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

### *A "Sound Business Purpose" Supports the Sale*

45.     As set forth in the First Day Declaration, prior to the Petition Date, the Debtors were in default of their obligations under the Prepetition Financing Agreement.  In light of their deteriorating cash position and lack of realistic stand-alone restructuring options, the Debtors have determined, in the exercise of their reasonable business judgment, that the most effective way to maximize the value of their estates for the benefit of their constituents is to sell the Acquired Assets pursuant to Bankruptcy Code section 363 to the highest or otherwise best bid.

46.     The Stalking Horse APA establishes a floor price for what the Debtors anticipate will be a robust Auction.  The Stalking Horse APA and the Bid Procedures permit the Debtors to seek out higher or otherwise better offers at the Auction.  At the same time, the Credit Bid Cap set forth in the Bid Procedures will encourage potential bidders to participate in the sale process because they will know, at the outset of the Chapter 11 Cases, the price point at which the Stalking Horse Bidder will walk away from the assets, even though it would otherwise have the right to submit a substantial overbid in the form of a subsequent credit bid.  This will ensure that the market sets the value for the Acquired Assets and that the Sale will maximize value of the Debtors' business for the benefit of all of the Debtors' stakeholders.  Accordingly, the Debtors have provided a sound business purpose in pursuing the approval of the Sale.

### *Sufficient Notice of the Proposed Sale Has Been Provided to Interested Parties*

47.     Pursuant to the Bid Procedures and the notice procedures set forth herein, the Debtors will employ various methods of notification to ensure that all interested and potentially affected parties will be informed of the Sale.  In order to generate the greatest number of bidders possible for the Sale and to satisfy the requirements of Bankruptcy Rule 2002, the Debtors will serve the Sale Notice upon the Sale Notice Parties.

48.    Additionally, the Debtors will file and serve the Cure Notice on all non-Debtor counterparties to the Contracts providing them with notice of this Motion, the potential assumption and assignment of Contracts and the Debtors' proposed Cure Amount.

49.    Finally, as explained above, the Debtors and their professionals also have reached out to over one hundred twenty (120) potential purchasers regarding a potential transaction after and in the months leading up to the Petition Date.  The Debtors submit that more than ample notice of the Sale has been provided to interested parties under the facts and circumstances of these Chapter 11 Cases.

### The Proposed Sale is for a Fair and Reasonable Price

50.    The Debtors submit that the Purchase Price – in particular, the Credit Bid Cap component of the Purchase Price – is fair and reasonable for the Acquired Assets.  The Purchase Price set forth in the Stalking Horse APA is the result of numerous rounds of arms' length, good faith negotiations with the Stalking Horse Bidder.  As explained above, the Purchase Price in the Stalking Horse APA will serve as the floor price for competing bids.

51.    The Bid Procedures have been designed to ensure that the highest or otherwise best offer for the Acquired Assets will be attained.  With the assistance of SSG, the Debtors continue to (i) conduct a comprehensive marketing process in order to maximize value, (ii) solicit the interest of various potential strategic and financial buyers and (iii) entertain offers for an alternative sale transaction that will maximize the value of the Debtors' business.  The Debtors expect that their continued marketing efforts will result in the submission of one or more competing bids prior to the proposed Bid Deadline of October 18, 2017.  In the event that a Qualified Bid other than that of the Stalking Horse Bidder is received, the Bid Procedures provide that an Auction will be held to determine the highest or otherwise best bid.

52.    Because the ultimate purchase price for the Acquired Assets will be determined in accordance with the Bankruptcy Court-approved Bid Procedures at an Auction, it will be fair and reasonable as contemplated by Bankruptcy Code section 363. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 149 (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re Nat'l Health & Safety Corp.*, 1999 Bankr. LEXIS 1126 (Bankr. E.D. Pa. Sept. 2, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

### *The Proposed Sale Has Been Negotiated at Arm's Length and in Good Faith*

53.    The "good faith" prong of the *Abbotts Dairies* standard is also satisfied.  The Debtors request that the Bankruptcy Court find that the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the Sale.  Bankruptcy Code section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

54.    Bankruptcy Code section 363(m) thus protects the buyer of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the Acquired Assets if the order allowing the sale is reversed on appeal.  By its terms, Bankruptcy Code section 363(m) applies to sales of interests in tangible assets, such as the Acquired Assets.

55.    The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Successful Bidder's purchase agreement was an arm's-length

transaction, in which the Successful Bidder acted in good faith. The Debtors and the Successful Bidder negotiated the Successful Bidder's purchase agreement in good faith and without collusion or fraud of any kind. The Successful Bidder has not engaged in collusion or any conduct that would otherwise control or tend to control the sale price as between or among Potential Bidders. The Bid Procedures are designed to maximize rather than chill competitive bidding and the Auction promotes an open and competitive sale process. The Debtors have had their own legal counsel in negotiations over the Stalking Horse APA or the Successful Bid and will have their own legal counsel to negotiate on their behalf throughout the Auction and the Sale. Accordingly, the Debtors request that the Bankruptcy Court make the finding at the Sale Hearing that the Successful Bidder, including, if applicable, the Stalking Horse Bidder, has purchased the Acquired Assets in good faith within the meaning of Bankruptcy Code section 363(m).

### *All Pertinent Information Regarding the Proposed Sale Has Been Fully Disclosed*

56.     The Debtors have presented the proposed asset sale openly and in good faith. The Stalking Horse Bidder's identity and any connection with the Debtors has been fully disclosed in this and other pleadings filed with the Bankruptcy Court. The Debtors have fully disclosed and requested the Bankruptcy Court's approval of all of the terms and conditions of the proposed Sale. Sufficient and adequate notice of this Motion has been provided to interested parties and such parties will receive further notice of the Sale and all relevant dates and deadlines related thereto through the Bankruptcy Court-approved Sale Notice.

57.     The Debtors will be prepared to introduce evidence at the Sale Hearing regarding the arm's-length, good faith nature of the Auction and the negotiation of the Stalking Horse APA. Indeed, the Debtors will be able to demonstrate that the Stalking Horse APA with the Stalking Horse Bidder or the Successful Bidder, as applicable, represents the highest or

otherwise best bid available to the Debtors for the Acquired Assets following a robust marketing and competitive bidding process. Accordingly, the Sale pursuant to the Stalking Horse APA has been proposed and fully disclosed in good faith and represents the sound business judgment of the Debtors; and, as such, is entitled to Bankruptcy Court approval.

**F.    The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f)**

58.    Under Bankruptcy Code section 363(f), a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Bankruptcy Code section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

59.    Here, the Sale satisfies the criteria set forth in Bankruptcy Code section 363(f). The Debtors believe that, at a minimum, they satisfy the fifth prong of section 363(f) because the holders of any liens, claims, encumbrances, or interests could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their lien, claim, encumbrance, or interest.

**G.    The Assumption and Assignment of Executory Contracts
and Unexpired Leases Should Be Authorized.**

60.    As explained above, Bankruptcy Code section 365(a) provides, in pertinent part,

that a debtor-in-possession "subject to the court's approval, may assume or reject any executory

contract or [unexpired] lease of the debtor."    11 U.S.C. § 365(a).    The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an executory contract or

unexpired lease is whether the debtor's reasonable business judgment supports assumption or

rejection. *See, e.g., Stable Mews,* 41 B.R. at 596.    If the debtor's business judgment has been

reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or

executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.,* 318

U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989).    The business judgment

test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or]

rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn

Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)

(quoting *Stable Mews Assoc.,* 41 B.R. at 596).    Any more exacting scrutiny would slow the

administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten the court's ability to

control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311

(5th Cir. 1985).    Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to

assume an executory contract, it must "cure, or provide adequate assurance that the debtor will

promptly cure," any default, including compensation for any "actual pecuniary loss" relating to

such default.    11 U.S.C. § 365(b)(1).

61.    Once an executory contract is assumed, the trustee or debtor-in-possession may

elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir.

2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

62.     Bankruptcy Code section 365(f) provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

63.     Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).   Moreover, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor.  This provision provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default…;

> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

64.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

65.     As set forth in the Stalking Horse APA, to the extent any defaults exist under any Assigned Contract sought to be assumed by the Debtors and assigned to the Successful Bidder such defaults are required to be cured as required under Bankruptcy Code section 365(b)(1).

66.     The Debtors believe that the Successful Bidder has the financial capability to satisfy any and all obligations they will incur in connection with the Assigned Contracts. In addition, to be a Qualified Bid, any Qualified Bidder must establish it has the financial capability to satisfy any and all obligations it will incur in connection with the Assigned Contracts. Additionally, facts will be further adduced at the Sale Hearing to show the financial credibility of the Successful Bidder, its experience in the industry and its willingness and ability to perform under the Assigned Contracts. Because the Sale Hearing will provide the Bankruptcy Court with an opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required by Bankruptcy Code section

365(b)(1)(C), the Debtors submit that the Bankruptcy Court should authorize the assumption and assignment of the Assigned Contracts by the Debtors, effective upon the Closing of the proposed Sale.

67.     Additionally, the contract procedures set forth herein provide that all of the counterparties to Contracts with the Debtors will be given notice of this Sale Motion and through the Cure Notice and any Additional Cure Notice have been provided with notice of the potential assumption and assignment of their Contract and the Debtors' proposed Cure Amounts associated therewith.     Based on the foregoing, the Debtors respectfully submit that its assumption and assignment of the Assigned Contracts satisfies the requirements under Bankruptcy Code section 365(f)(2)(A) and (B).

**H.     Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

68.     The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  As set forth above, the relief requested herein is essential to maximize the value of the Debtors' business for the benefit of all stakeholders.

69.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to Bankruptcy Code section 363 are automatically stayed for fourteen (14) days after entry of the order.  *See* Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(g).

70.     Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to Bankruptcy Code section 365(f) for fourteen (14) days, unless the court orders otherwise.  *See* Fed. R. Bankr. P. 6006(d).

71.     To preserve the value of the Acquired Assets and limit the costs of administering and preserving such assets, it is critical that the Debtors close the Sale as soon as possible after all closing conditions have been achieved or waived.  Additionally, the Stalking Horse APA requires the Closing to occur within eighty (80) days following the Petition Date.  Accordingly, the Debtors hereby request that the Bankruptcy Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

72.     Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

## NOTICE AND NO PRIOR REQUEST

73.     No prior Motion for the relief requested herein has been made to this or any other court.

74.     Notice of this Motion as it relates to approval of the Bid Procedures has been given to the Sale Notice Parties, but excluding the Debtors' known creditors.  Notice of the Motion as it relates to the approval of the Sale and related requests will be given to the Sale Notice Parties.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Bid Procedures Order; (ii) entry of the proposed Sale Order; and (iii) such other and further relief as the Bankruptcy Court deems just and proper.

Dated: August 10, 2017
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Joseph D. Wright (No. 5669)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      wright@lrclaw.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*

{1097.001-W0048169.}